UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
:
KATARINA PEDA, :
:
        Plaintiff, :
:
  -against- :
: 12 Civ. 0586 (PAC)
NEW YORK UNIVERSITY HOSPITALS :
CENTER, HOSPITAL FOR JOINT :
DISEASES, and CANDY KRAMER, : OPINION & ORDER
*Individually* :
:
        Defendants. :
------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 17, 2014
```

HONORABLE PAUL A. CROTTY, United States District Judge:

    Plaintiff Katarina Peda ("Peda") claims that New York University Hospitals Center, Hospital for Joint Diseases ("NYUHC"), and "Candy Kramer" (whose correct name is "Linede Kraemer")(collectively, "Defendants") violated the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.* ("FMLA") by interfering with Peda's exercise of FMLA rights and retaliating against her for requesting FMLA leave. Plaintiff's Complaint also alleges five claims under the New York City Human Rights Law, Administrative Code § 8-107 *et seq.* ("NYCHRL"). Plaintiff subsequently withdrew her claim that Defendants interfered with her rights under the NYCHRL (Pl. Opp. Br. at 2.) Further, Plaintiff does not press her vicarious liability claim which she titles "Employer Liability."[1] The three remaining NYCHRL claims are (1) Defendants discriminated against Peda because she was about to undergo surgery that would render her

---

[1] This is most likely because she asserts that NYUHC was directly liable for the discriminatory and retaliatory behavior she alleges.

1

disabled, and Defendants failed to make reasonable accommodations for her disability; (2) Defendants retaliated against her by terminating her employment after she requested reasonable accommodation for her disability; and (3) Defendant Kraemer aided and abetted discriminatory behavior under the NYCHRL by firing her, instead of making reasonable accommodations for her disability.

Defendants move for summary judgment on all claims.  Peda had a long history of disruptive behavior, resulting in the application of progressive discipline coupled with Notices of Corrective Action.  A further incident on October 15, 2011 caused her termination.  Peda's supervising nurse, Defendant Kraemer, sought guidance from the Human Resources Director, Austin Bender, who advised that if the incident were to be documented, terminating Peda would be the appropriate action.  Witness statements confirmed that Peda's misconduct had created the incident, and NYUHC decided to terminate Peda on November 10, 2011.  NYUHC did not communicate the decision to Peda at that time, however, because of a policy entitling an employee to be interviewed with a union representative present before discipline could be imposed.  After the interview, Peda was officially terminated on December 2, 2011.  On November 28, 2011—after November 10 when the termination decision was made, but before December 2 when Peda was officially terminated—Peda had a conversation with Defendant Kraemer which gives rise to her FMLA and NYCHRL claims.  Since it is clear that NYUHC's decision to terminate Peda for disruptive and unprofessional behavior was made prior to the conversation giving rise to her claims, Peda could not have been terminated because of her FMLA request or her request for disability accommodation.

Accordingly, the Court grants Defendant's motion for summary judgment.

## BACKGROUND[2]

**I. The Parties**

Plaintiff Katarina Peda began working for Defendant NYUHC as a registered nurse in July 2003. (Def. 56.1 Stmt. ¶¶ 2, 3.) NYUHC is a non-profit hospitals corporation formed under Article 28 of the New York State Health Law. (Def. 56.1 Stmt. ¶ 1.) Throughout her employment, Peda was a member of the Service Employees International Union Local 1199. (Peda Tr. 14:12-17; Kraemer March Decl. ¶ 25.) Peda's work responsibilities primarily consisted of providing perioperative services—services rendered during the time period of patients' surgical procedures, including admission, surgery, and recovery. (Peda Tr. 21:6-8; Mesidor Decl. Ex. H.) In particular, Peda's job included "Circulating Duties" such as reviewing daily caseloads, placing patients on operating tables, assisting anesthesiologists and surgeons, and preparing the surgical area; and "Scrub Duties," such as conducting preoperative counts of sponges, needles, and instruments, arranging such supplies for surgery, medication delivery, and record-keeping. (Peda Decl. Ex. H.)

Peda had a recurring back injury that caused her to take extensive time off from work during the beginning of her tenure. (Peda Decl. ¶ 2.) For example, Peda took 40 days of paid leave for her back injury in 2007. (*Id.*) Peda was otherwise physically able to perform her job. Peda worked for NYUHC for over 8 years, working 12 hour shifts for three to four days per week on average. (Peda Decl. ¶ 1.)

Defendant Linede Kraemer, a Nurse Manager at NYUHC, was one of Peda's supervisors throughout the time of Peda's employment. (Kraemer Decl. ¶ 2.) Kraemer evaluated Peda's

---

[2] The facts stated herein are taken from the parties' submissions and are undisputed unless characterized as "alleged" or otherwise indicated as disputed.

performance, both for the probationary period at the beginning of Peda's tenure at NYUHC, and subsequently in annual performance reviews. (Mesidor Decl. Ex. H.)  The annual performance reviews were used to evaluate Peda throughout her employment at NYUHC, both as to her job duties, and also in areas pertaining to her professionalism, including "Professional Development," "Attendance/Reliability," and "Communications/Relationships with Others." (*Id.*)

## II.  Peda's Work Record Before Her Work-Related Injury and Resulting Medical Leave

From the beginning of her employment at NYUHC, Peda was counseled regarding her interactions with coworkers and her professionalism.  The performance review of Peda's probationary period at the beginning of her tenure identified that Peda needed to "[i]mprov[e] her communication skills by being more flexible and more aware of [her] verbal and non-verbal communication." (Kraemer Decl. Ex. C, at D000586.)  In her annual performance review for her first year of work, Kraemer noted that Peda "[r]emains inflexible and needs to be more open to suggestions," and gave her a failing mark of "1" in the categories of "[a]ccepts guidance, supervision and criticism if needed" and "[acceptance of] guidance, supervision and criticism if needed."  (Kraemer Decl. Ex. D at D000513, D000569 & D000570.)

Despite intermittent signs of "positive progress" (see Mesidor Decl. Ex. H at D00560), Peda's work records contain numerous reports from Peda's coworkers and supervisors about Peda's insubordinate conduct, inappropriate communications, and work infractions.[3]  On September 17, 2007, Edner Aura, a Housekeeping Worker accused Peda of harassing and

---

[3] In her response to Defendants' Rule 56.1 statement Plaintiff disputes the underlying facts for many of these reports, and denies that she was ever informed about them.  She does not, however, dispute the existence of the records, nor does she point to evidence to suggest that Defendants fabricated the reports.

4

discriminating against him. (Kraemer Decl. Ex. G.) Days later, Jean Mamakos, the NYUHC Nurse Supervisor, reported that Peda contradicted her directions regarding changing a surgery schedule in front of other surgeons. (Kraemer Decl. Ex. I.) On June 4, 2008, another nurse, Joyce Nwoko, reported that Peda yelled at her to the point that she felt "frightened working with [Peda] in the future." (Kraemer Decl. Ex. J.) In an unusual twist, on September 14 and 18, 2009, Peda's union delegate, nurse Victoria Weber, submitted complaints about two different incidents with Peda, one of which involved Peda screaming at Nurse Mamakos and another coworker. (Kraemer Decl. Ex. O.) On October 13, 2009, Nurse Mamakos reported an incident in which Peda threw an implant at her, and another in which Peda refused an assignment. (Kraemer Decl. Ex. P.) Mamakos opined "I find Nurse Peda a negative force, a definite hazard in the Operating Room and a safety concern to patients, surgeons, staff and the management team." (*Id.*)

These complaints were reflected in Peda's 2008-2009 evaluation, in which Peda received failing marks in over 10 job performance categories, including her ability to coordinate care delivered by nursing staff; accepting guidance, supervision, and criticism; communicating with other health team members as directed; communicating ideas, problems, suggestions and messages in a timely and effective manner; and adhering to departmental and Hospital guidelines concerning safety, and rules of conduct. (Mesidor Decl. Ex. H.) Her evaluation contained comments such as Peda "[is] [n]ot a team player, does not communicate appropriately with team members, uses inappropriate body language, tone of voice and choice of words"; "[n]eeds to communicate using a unoffensive [sic] nonverbal style and demonstrate respect for staff member feelings"; "[d]oes not cope well in stressful situations"; "[s]hould strive to clarify prior to becoming angry"; and "[d]emonstrates a lack of respect for authority." (*Id.*)

**III. Peda's Work-Related Injury and Subsequent Leave**

On October 22, 2009, Plaintiff sustained a work-related injury. (Def. 56.1 Stmt. ¶ 4.) She tripped over an electrical cord, bruising her knees and injuring her hip and back. (Peda Tr. 36:16.) Peda filed a workers' compensation claim and was absent from work for two days after the incident. (Def. 56.1 Stmt. ¶ 5.) Four months later, in February 2010, she took a leave of absence due to her injuries, and returned to work July 11, 2010. (Def. 56.1 Stmt. ¶ 6; Mesidor Decl. Ex. H at D000514.) It is undisputed that NYUHC complied with its FMLA obligations regarding Peda's 2010 leave of absence: NYUHC granted Peda FMLA leave and reemployed her at her position when she returned to work.

**IV. Further Complaints and Progressive Discipline After Peda's Return to Work**

After Peda returned to work, complaints about her continued to mount, resulting in progressive discipline. On December 3, 2010, Peda received a Notice of Corrective Action for events that occurred on October 29, November 9, and December 1. (Kraemer Decl. Ex. Q.) The notice was for "demonstrating abusive, disrespectful, unprofessional rude behavior on 3 occasions, making unfounded accusatory statements in a public place in a loud and abusive manner." (*Id.*) Included on the notice was a warning stating that "[i]mmediate satisfactory improvement is necessary" and "[a]ny additional violation of Hospital rules will result in further and more severe corrective disciplinary action up to and including termination of your employment." (*Id.*)

Subsequent work infractions resulted in Peda's further progressive discipline. On April 28, 2011, a nurse supervisor, Clarita Tan, reported to Kraemer that Peda had mocked her accent when Tan paged a physician, and Peda laughed about it afterward. (Kraemer Decl. Ex. T.) Tan

6

perceived Peda's imitation to be not only embarrassing but racially discriminatory. (*Id.*) The next day Tan reported another incident where Peda refused to listen to her guidance in setting up an Operating Room and instead walked out. (Kraemer Decl. Ex. U.) On May 3, 2011, Maggie Benanati, a clinical coordinator who supervised Peda, reported that Peda had refused to listen to her instruction not to stand in the hallway in front of the assignment board (Kraemer Decl. Ex. V) because blocking the corridor in that way could jeopardize patient safety. (Benenati Tr. 62:9-10.)  As a result of these incidents in May and April, 2011, Peda received a one-day suspension. (Kraemer Decl. Ex. Z.)  Peda was given another Notice of Corrective Action, dated May 11, 2011, for "[d]emonstrating unprofessional behavior, refusal to carry out instructions of a supervisor[,] and insubordination." (Kraemer Decl. Ex. W.)  The same termination warning was issued, only this time the part stating that further infractions could lead to "termination of employment" was starred and underlined. (*Id.*)

## V. The October 15, 2011 Incident and Subsequent Investigation

On October 15, 2011, Kraemer was informed that Peda had yelled at another nurse, Lisann Giscombe, about operating room assignments in the presence of a patient waiting to undergo surgery and the patient's relative (the "October Incident"). [4] (Kraemer Tr. 76:6-11; 82:15-20.)  Kraemer spoke with a number of people that day about the incident, including Andrew Wuthrich, Martha Johnson, and Carol Still. (Kraemer Tr. 76:18-77:4.)  After collecting preliminary information, Kraemer sent an email, dated October 26, 2011, to Human Resources ("HR") Director Austin Bender:

Katarina Peda was yelling at a co-worker who wrote her up in the holding room in front

---

[4] The parties dispute whether both parties were yelling, how long the interaction was, as well as other specifics of the event, but it is undisputed that the event occurred and that it was reported to Kraemer.

>of a patient and his family on Saturday October 15th. I would like to take correct action and would like to know since she was suspended last time what steps do I take?

(Bender Decl. Ex. A.) Bender replied in an email approximately 20 minutes later:

>[P]lease try to have all witnesses submit written statements and then interview Peda with a delegate. Try to have Peda submit a written statement. Contact me once the investigation is complete so we can review. <u>Certainly if there is sufficient evidence, then termination is the next step.</u>

(*Id.*)(emphasis added). Bender testified that he "felt that this was appropriate, given Ms. Peda's disciplinary history, the egregiously unprofessional nature of her alleged behavior during the October Incident, and the fact that she had behaved this way in the holding room in front of a patient who was about to undergo surgery and should not have been subjected to such a disturbance." (Bender Decl. ¶ 13.)

Pursuant to Bender's advice, Kraemer collected written statements about the incident. The witness statements confirmed that Peda was yelling in front of a patient. Wuthrich, a nurse, wrote "[Peda's] voice was loud enough for the first patient to hear" (Kraemer March Decl. Ex. A at D000433-434). Martha Johnson, an anesthesia technologist, stated that Peda "arrived in [the] Holding Area and began screaming for Lisann Giscombe" and acted in "a very unprofessional manner" (Kraemer March Decl. Ex. B). Carol Still, a unit clerk, wrote that, while a patient was in the holding room, "Peda came in yelling at the other nurse [Giscombe] saying she's not going for this[:] [']you have to do the first room[']" and that "[Giscombe] told [Peda] this is not the right place to talk about this and walked away." (Kraemer March Decl. Ex. C.)

The investigation took time to complete. Kraemer had to determine who the eyewitnesses were, collect their statements, and interview Peda in the presence of her union representative from Local 1199. (Kraemer March Decl. ¶ 25.) Peda was willing to have only a particular union delegate, Joyce Lemon, represent her during her interview (Kraemer March

Decl. ¶ 25.), since Peda had personal conflicts with other union delegates.[5] (Bender Decl. Ex. B.) Peda was absent on days the interview was to be conducted, and Lemon was absent on other days, resulting in further delays. (*Id.*; Kraemer March Decl. ¶ 25.)

Bender testified that, by November 10, 2011 he had already received a "detailed update" regarding the October Incident; the need for confirmatory written documentation of the October Incident had been satisfied. (Bender Decl. ¶ 17.) He had already reviewed witness statements, including statements from members of Peda's union. (*Id.*) In addition to Bender's undisputed testimony to this effect, the record shows that one such witness statement was attached to the first email that Kraemer sent Bender about the incident, dated October 26. (Kraemer March Decl. Ex. A.) Bender had discussions about the October Incident and the decision to terminate Peda with Kraemer and the Director of Perioperative Services, Nancy Berger, to whom Kraemer reported (Kraemer Tr. 65:8). Based on the information he received, Bender believed that termination was the appropriate remedy. (Bender Decl. ¶ 17.) At his deposition, he testified:

> There had been a series of improper behaviors on the part of Ms. Peda towards co-workers. . . [T]his had been noted in prior evaluations, and then after that, there was a first warning about it, and then the suspension, and now the termination. These were serious incidents, where she made a staff member cry once, allegedly. She had yelled and screamed at an employee in front of a patient. These are very serious issues. She had mocked her supervisors. These are serious issues. There wasn't just one. There were numerous incidents with numerous witnesses of staff [] and managers. At this point, termination was appropriate. (Bender Tr. 74:11-25.)

In an email on November 10, 2011 with subject line "Re: Katerina Peda," Bender confirmed his decision to terminate Peda, writing to Berger "Remember to let me know when [Peda] is

---

[5] For example, Peda had conflicts with union delegate Victoria Weber, who had submitted complaints about Peda. (See page 5 *supra.*)

terminated so I can officially inform 1199." (Bender Decl. Ex. B. at D001466.) (emphasis added). That decision to terminate was not communicated at the time because the interview with Peda and her selected union representative had not yet been conducted due to scheduling problems, first with Peda and then with her union representative. (*Id.;* Kraemer March Decl. ¶ 25.)

Eventually Kraemer was able to interview Peda with Lemon present (Kraemer March Decl. ¶ 26.). Peda refused to provide a written statement about the October Incident. (*Id.*)

## VI. Kraemer's Alleged Discrimination and Retaliation Against Peda

Peda's discrimination and retaliation claims arise from a conversation she had with Kraemer on November 28, 2011. (Peda Tr. 36:22-24.) Kraemer admits there was a conversation. (Kraemer Tr. 113:2-5.) The parties dispute what was said.

Peda testifies that, in that November 28 conversation with Kraemer, she requested a reasonable accommodation to begin in January because she was going to have surgery on her knee. (Peda Decl. ¶ 23.) Peda asked that she be allowed to work the night shift, and work 7.5 hours per shift instead of 12 hours, beginning in January after her surgery. (*Id.* at ¶ 24.) Peda alleges that in the conversation, Kraemer told her she is no longer a "spring chicken" and told her to find an easier job. (Peda Decl. 37:10-13.) Peda testified as follows:

> [S]he told me, are you aware that you are 340 hours this year on sick leave, and I can hardly make a schedule[?] [Y]ou are not reliable. And I told her this is because of my injuries which I sustained at work. And she told me, why don't you look for another easier job. She told me that I'm not anymore [a] spring chicken. And then I told her, then I'm planning to go [] back to work to [a] seven and a half hour shift, it's going to be easier. And then she asked me [] can you give me this in writing, she told me. And then I said then I'm [] planning to have a surgery in January

> on my other knee, and there [is] where she made [the] decision to fire me.

(Peda Tr. 37:5-20)(brackets added for clarity).  Peda claims that Kraemer's response and her facial expression when Peda said she was going to have knee surgery indicated that it was then that Kraemer made the decision to fire her.  (Peda Tr. 37:5-20.)

Peda alleges that Kraemer did not like the fact that she was taking so much sick leave for her injuries. (Peda Tr. 36:16-18.)  For support, she cites previous performance evaluations that postdate her work-related injury, in which she was given failing marks in the attendance category; namely, her 2009-2010 Performance Evaluation ("67 sick for this monitoring period, out on sick leave due to injury" (Mesidor Decl. Ex. H at D000514)) and her 2010-2011 Performance Evaluation ("33 Sick days for this monitoring period.  Late 15 times for this monitoring period. This requires immediate and sustained improvement." (Mesidor Decl. Ex. H at D000504)).

Kraemer disputes that she told Peda that "she" is not a spring chicken, claiming instead that she told Peda "we" are not spring chickens, since both Kraemer and Peda are similar in age (Kraemer Tr. 113:21-114:5.)  Kraemer attests that this comment is age-related, not disability-related, and in any event had nothing to do with Peda's injuries or leaves of absence. (Kraemer March Decl. ¶ 15.)  She also says she told Peda that she might benefit from a less stressful job. (Kraemer Tr. 114:3-9.)  Kraemer also testified that she asked Peda to put her disability accommodation request in writing because implementing the accommodation would require the request to be submitted to HR. (Kraemer March Decl. ¶ 16.)

Kraemer states that her negative comments about Peda's work attendance were not motivated by animus for Peda's injury or requests for leave, but rather by Peda's lack of advance

11

notification for her absences, which made her an unreliable employee. (Kraemer March 12 Decl. ¶ 15.) Kraemer's comments about Peda's absences on Peda's last performance evaluation (2010-2011) state that "Katarina needs to focus her attention to reducing unplanned time away from duty, both lateness and sick time as this negatively impacts patient care. . . ." (Kraemer Decl. Ex. H at D000506.)

## VII. Peda's Termination and Grievance Procedure

The last written witness statements about the October Incident are dated December 1, 2011 (statement of Martha Johnson) and December 2, 2011 (statement of Carol Still). (Kraemer March Decl. Ex. B.) Both statements confirm that Peda yelled at another nurse in front of a patient about to undergo surgery. (*Id.*) Peda was officially terminated on December 2, 2011, the date of the last written witness statement. (Kraemer March Decl. ¶ 30.) Kraemer held a meeting with Peda in Kraemer's office that day at which she told Peda she was fired. (*Id.*) Kraemer documented the termination in a Notice of Corrective Action, which states that Peda was terminated for "arguing with a coworker in the presence of a patient and their family member." (Kraemer Decl. Ex. Z.)

On December 28, 2011, a grievance procedure was held in which Peda, with the representation of her union, challenged her termination. (Bender Decl. ¶ 23.) Bender presided over a Step-III hearing, the purpose of which was to give both the union and management an opportunity to convey their views of the incident that led to termination. (*Id.* at ¶ 20.) Bender, Kraemer, Nancy Berger, Peda, and Joyce Lemon, who was Peda's union representative, attended the hearing. (*Id.* at ¶ 24.) Bender documented what happened at the hearing in a letter addressed to the union, dated December 30, 2011. (Kraemer Decl. Ex. Z.) The letter references the written

statements of Still, Johnson, and Guthrich, as well as Lisann Giscombe, who stated that during the October Incident, Peda had "yell[ed] and scream[ed] at [her] in a loud, unprofessional tone in the holding room with the patient present." (*Id.*)  The letter also includes a thorough description of Peda's version of events, including her account that Giscombe refused to switch operating rooms with her, and that a nurse supervisor, Rizalina Amores-Lacsina "screamed at [Peda] in a violent way." (*Id.*)  In the letter, Bender considers the union's arguments that termination was too harsh a penalty for the offense. (*Id.*)

As the letter describes, after reviewing the evidence and testimony at the hearing, Bender determined that Peda's version of events was not credible. (*Id.*)  He noted that "[a]ll 4 union witnesses consistently found the grievant either yelled, screamed, and/or raised her voice in front of a patient simply because she was upset that her coworker would not switch rooms with her." (*Id.*)  In his written decision, Bender described why this behavior "cannot be tolerated," and cited Peda's past disciplinary record, including the written warning she received on December 3, 2011, and her 1-day suspension in July 2011 (see section IV, page 6 *supra*). (*Id.*)  Bender concluded

> The grievant has been spoken to about her behavior but simply is unable to comport herself in a professional and respectful manner.  She has shown no improvement despite progressive discipline.  As a result, termination is the only appropriate penalty.

(*Id.*)  The hearing record is barren of any reference to wrongful termination due to Peda's disability or request for FMLA leave.  Local 1199 had the opportunity to take the grievance to arbitration if they felt Peda was wrongfully terminated, but did not do so. (Bender Decl. at ¶ 32.)

## DISCUSSION

### I. Legal Standard

"Summary judgment is appropriate when, construing the evidence in the light most favorable to the non-moving party, 'there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law.'" *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).  A fact is material only if it "might affect the outcome of the suit under the governing law," and a factual dispute is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Nonetheless, "summary judgment is improper when the court merely believes that the opposing party is unlikely to prevail on the merits after trial." *Am. Int'l Grp., Inc. v. London Am. Int'l Corp. Ltd.*, 664 F.2d 348, 351 (2d Cir. 1981).

  The moving party bears the initial burden of producing evidence on each material element of its claim or defense demonstrating that it is entitled to relief.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The evidence on each material element must be sufficient to entitle the movant to relief as a matter of law.  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

  Once the moving party has made an initial showing that no genuine dispute of material fact remains, the nonmoving party may not refute this showing solely by means of "[c]onclusory allegations, conjecture, and speculation," *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003), but must instead present specific evidence in support of its contention that there is a genuine dispute as to material facts.  Fed. R. Civ. P. 56(c).  The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

**II.**  **Analysis**

  All of Peda's claims fail as a matter of law because the decision to terminate her was made before she had the conversation with Kraemer which gave rise to her FMLA and

NYCHRL claims. No reasonable juror could conclude that Peda's termination was the result of any discriminatory or retaliatory animus.

On October 26, Kraemer emailed HR Director Austin Bender to ask him about the appropriate next steps regarding the October Incident. Kraemer was not the one who decided that terminating Peda was appropriate. Instead, it was Austin Bender who responded that day to Kraemer's email that if witness statements confirmed Peda had yelled at a nurse in front of a patient on October 15, Peda would be terminated.

There is no genuine dispute that on November 10, 2011 Bender decided to terminate Peda. Bender had received the necessary documentation: the witness statements fully confirmed that Peda yelled at another nurse in front of a patient about to undergo surgery.[6] Bender based his decision on these witness statements, a detailed update about the October Incident, the egregiousness of Peda's conduct during that incident, and Peda's history of infractions. He wrote an email to Nancy Berger on November 10 saying "Remember to let me know when [Peda] is terminated so I can officially inform 1199." (Bender Decl. Ex. B.) The decision was not implemented at that time only because Peda had to be interviewed with a union representative present, a process that was delayed due to scheduling problems with both Peda and her union representative.

The record reflects that the October Incident was the proverbial "straw that broke the camel's back." It was the third strike in Peda's progressive discipline. Peda had a work record filled with complaints from supervisors, other union members, and even a union delegate, about

---

[6] Whether Nurse Giscombe or Amores were fired is immaterial to Peda's termination. The witness statements support that Peda was the one who started the incident by yelling. Plaintiff has also not provided any evidence that Giscombe or Amores had similar records of behavioral problems, with resulting discipline, as Peda has, or that they are similar to her in any way.

her aggressive and insubordinate behavior.  Peda had already received written warnings, and a one day suspension for different instances of verbally abusing coworkers and refusing to follow instructions.  She was on notice from these warnings that any further work infractions could lead to termination.

Peda's FMLA and disability claims arise from her requests for time off and accommodation due to anticipated knee surgery.[7]  As of November 10, 2011, when the decision to fire Peda was made, Peda had neither requested FMLA leave, nor was she disabled.  She first made her FMLA leave and disability accommodation requests in a conversation with Kraemer on November 28, 2011.  There is no causal connection between Peda's FMLA and accommodation requests and her termination, since the decision to terminate Peda was made well before she ever made the requests.

Peda neither alleges nor provides any evidence that Bender, the one who recommended termination, was influenced by a discriminatory motive or a desire to prevent Peda from taking FMLA leave.  There is no causation, since Bender had already made the decision to fire Peda before her request for FMLA leave and for disability accommodation.  Bender provides undisputed testimony that he had no knowledge of these requests (or, for that matter, the amount of time off from work that Peda had taken in the past). (Bender Tr. 78:1-79:11.)  Peda also does not allege or provide evidence that any discriminatory motive Kraemer may have possessed influenced Bender's decisionmaking, or that Kraemer was the one who recommended termination.  To the contrary, Kraemer's October 26 email asked Bender what the next disciplinary step for Peda should be, and Bender answered "termination."

---

[7] This surgery was to be performed months later in January, 2012, and the accommodation was to be made when she returned to work after that surgery.  At the time that Peda made the request, she was working full shifts at the hospital.  Peda neither alleges nor provides evidence that she was disabled at the time she made her request.

Defendants made the decision to terminate Peda's employment well before the November 28 conversation that gave rise to her FMLA and NYCHRL claims. Peda's claims therefore all fail as a matter of law.

### A. FMLA Claims

The FMLA provides "job security for employees who have serious health conditions that prevent them from working for temporary periods." 29 U.S.C. § 2601. The Second Circuit recognizes two types of FMLA claims—"interference" claims and "retaliation" claims, *Potenza v. City of New York,* 365 F.3d 165, 168 (2d Cir. 2004) (per curiam), but for either type there must be a causal connection between the allegedly discriminatory behavior and the adverse employment action.

#### 1. Interference

Under the FMLA, "an employer is not liable for 'interfering' with an employee's leave when the employee would have been terminated regardless of the leave." *See Pearson v. Unification Theological Seminary*, 785 F. Supp.2d 141, 162 (S.D.N.Y. 2011) (citing *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 176 (2d Cir. 2006)). Since there is no causal connection between Peda's request for FMLA leave and her termination, Plaintiff has failed to establish that Defendants denied her FMLA benefits to which she was entitled.

#### 2. Retaliation

Peda's claims of retaliation fail for the same reasons as her interference claim. There must be a causal connection between the FMLA claim and the adverse employment action,[8] and

---

[8] Plaintiff's other vague allegations of retaliation that do not pertain to her termination also fail as a matter of law. Plaintiff does not provide any evidence of an adverse employment action based on any other times that she took FMLA leave. For example, Plaintiff does not show that the low marks she received for attendance on her performance reviews resulted in any reduction in her pay or change in her duties. *See Burlington Northern & Santa Fe Railway Co. v. White*, 126 S.Ct. 2405, 2415 (2006) (defining adverse employment action).

here there is none. *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004). Plaintiff fails to establish this element of the prima facie case for FMLA retaliation since the decision to terminate her was made before she requested FMLA leave, and thus was not tainted by any retaliatory animus.

### B. NYCHRL Claims

In light of the City Council's 2005 amendments to the NYCHRL, "courts must analyze NYCHRL claims separately and independently from any federal and state law claims." *Mihalik v. Credit Agricole Ceuvreux North America, Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (citing the Local Civil Rights Restoration Act of 2005, N.Y.C. Local L. No. 85). The Court must construe the NYCHRL "broadly in favor of discrimination plaintiffs, to the extent that such construction is reasonably possible." *Id.* But this broad construction does not eliminate the requirement of causation: "[A] defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory or retaliatory motives . . . ." *Mihalik*, 715 F.3d at 113 (citing *Williams*).

#### 1. Disability Discrimination and Failure to Accommodate

Plaintiff's disability claims arise from the November 28 conversation with Kraemer in which she asked Kraemer for a shorter work shift, to be implemented in the future after she returned from knee surgery. Plaintiff alleges that Defendants "didn't want to take the time to provide Ms. Peda with yet another reasonable accommodation . . . and instead terminated her employment." (Pl. Opp. at 14.) Under § 8–107(1)(a) of the New York City Administrative Code, it is "an unlawful discriminatory practice" to terminate someone on the basis of her disability. Nonetheless, "[t]he plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive . . . She must show that she has been treated less well at least

in part *because of* her [protected status]," here, her disability. *Id.* Plaintiff fails to meet this burden, since the decision to terminate Peda was made *before* she was disabled, and before she requested accommodation for her (future) disability. Her termination precluded the implementation of, and need for, any accommodation or associated interactive process.[9] Under any theory of liability, Plaintiff's NYCHRL claim fails.

### 2. Retaliation

A retaliation claim under the NYCHRL requires "a causal connection between a plaintiff's opposition [to her employer's discrimination] and the defendant's conduct." *Pedrosa v. City of New York*, No. 13 Civ. 01890, 2014 WL 99997 at *10 (S.D.N.Y. Jan. 9, 2014). Plaintiff's claim fails because, as discussed above, there is no causal connection between any opposition and her termination. She also fails to allege that she took any action opposing her employer's discrimination (by filing a complaint or otherwise).

### 3. Aiding and Abetting

A finding of some underlying discriminatory or retaliatory conduct by a principal/employer is essential to establishing liability for aiding and abetting under the NYCHRL. *Id.*; *see also Dewitt v. Lieberman*, 48 F.Supp 2d 280, 293 (S.D.N.Y. 1999); *Benson*, 2014 WL 657942 at *2. Here because Plaintiff has "fail[ed] to raise a triable issue of material fact that she was either retaliated against or discriminated against . . . her claims that defendants

---

[9] Furthermore, Peda admitted at her deposition that, when she asked for a different work schedule, Kraemer asked Peda to put her request in writing. (Peda Tr. 37:14-17.) Kraemer asserts in a sworn affidavit that a written request would be necessary to submit to HR for approval. (Kraemer March Decl. 16.) Peda admits she never put her request in writing. (Peda Tr. 40:6-16.) Plaintiff cites no case law that supports that this request to put her need for accommodation in writing was unreasonable, or was otherwise not a part of the interactive process the law requires for reasonable accommodation. On these facts, plus the fact that the decision to terminate her had already been made, no reasonable juror could find that Peda has a separate claim for failure to accommodate a disability, or failure to engage in an interactive process under NYC Administrative Code § 8-107(15)(a).

aided and abetted each other in any discrimination or retaliation cannot survive." *Forrest v. Jewish Guild for the Blind*, 819 N.E.2d 998, 1013 (N.Y. 2004).

## CONCLUSION

Defendants' motion for summary judgment is granted in its entirety. The Clerk of Court is directed to enter judgment in favor of Defendants and close this case.

Dated: New York, New York
March 17, 2014

SO ORDERED

*[signature]*
PAUL A. CROTTY
United States District Judge